IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER J. SELIS-EVANS, | ) | CASE NO. 3:18CV2414 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JACK ZOUHARY |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jennifer Selis-Evans ("Selis-Evans") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I. Procedural History

In October 2013, Selis-Evans filed an application for SSI, alleging a disability onset date of July 24, 2013.  Tr. 237.  She alleged disability based on the following: right knee surgery and reflex sympathetic dystrophy caused by her surgery.  Tr. 260.  After denials by the state agency initially (Tr. 137) and on reconsideration (Tr. 152), Selis-Evans requested an administrative hearing.  Tr. 164.  Hearings were held before an Administrative Law Judge ("ALJ") on April 25, 2016, and July 18, 2017.  Tr. 67-124.  In his August 3, 2017, decision (Tr. 11-29), the ALJ determined that there are jobs that exist in the national economy that Selis-Evans can perform,

i.e., she is not disabled. Tr. 28-29. The Appeals Council denied Selis-Evans's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Selis-Evans was born in 1980 and was 33 years old on the date she filed her application. Tr. 237. She graduated from high school and completed a few years of college. Tr. 74.

### B. Relevant Medical Evidence[1]

After ongoing complaints of right knee pain and instability, Selis-Evans underwent arthroscopic surgery in July 2013. Tr. 319-320. The surgery was performed by William Sanko, M.D. Tr. 319-320. At her one week follow up, Dr. Sanko stated that Selis-Evans was doing well but had not been moving her knee as instructed. Tr. 325. Upon exam, she had some swelling and limited range of motion. Tr. 325. Dr. Sanko prescribed Norco to use sparingly, encouraged aggressive physical therapy, and anticipated that she would be able to return to work in six to eight weeks. Tr. 325.

In September, Dr. Sanko remarked that Selis-Evans had not bounced back as quickly as she would have liked. Tr. 321. He commented that her late start with physical therapy and moving her knee postoperatively led to some problems. Tr. 323. Upon exam, her range of motion had improved to near normal and she was able to do a straight leg raise. Tr. 321. However, she reported a burning sensation around her knee that he was concerned might be early symptoms of Reflex Sympathetic Dystrophy (RSD). Tr. 321. Dr. Sanko stated that it was imperative she continue with physical therapy, prescribed Ultram and Neurontin for pain, and ordered her kept off work until her next appointment in four weeks. Tr. 321.

---

[1] Selis-Evans only challenges the ALJ's decision with respect to her physical impairments. Thus, only the evidence related to those impairments are summarized and discussed herein.

At her next appointment in October 2013, Selis-Evans stated that she was not doing better, she had stopped therapy, and she reported a significant burning sensation around her right knee. Tr. 356. Dr. Sanko described these symptoms as mild to moderate "RSD type symptoms." Tr. 356. Upon exam, she had no redness or warmth of skin, full range of motion, and scant effusion. Tr. 356. Dr. Sanko assessed a post-operative RSD problem, recommended continuing physical therapy, and increased her Neurontin dosage. Tr. 356.

In November, Selis-Evans returned to Dr. Sanko's office and saw a physician assistant. Tr. 354. She reported she had complied with Dr. Sanko's physical therapy and medication instructions but had no improvement in her knee pain, which she described as diffuse and affecting her walking. Tr. 354. Upon exam, she had tenderness to palpation, reported pain with range of motion, and had no effusion. Tr. 354. Dr. Sanko referred her to pain management. Tr. 355.

In December 2013, Selis-Evans saw pain management provider William Hogan, M.D. Tr. 461. Upon exam of her right knee, she had redness and blotchy skin around her knee, some swelling, slight warmth, hypersensitivity to touch, significantly reduced range of motion, and some atrophy of her right thigh muscle. Tr. 462. Dr. Hogan assessed that Selis-Evans's pain did appear related to RSD; he increased her gabapentin and recommended a lumbar nerve block. Tr. 462. In January 2014, Dr. Hogan performed two right lumbar nerve block injections. Tr. 463-464.

In February 2014, Selis-Evans saw a physician's assistant at Dr. Hogan's office and reported no relief from the nerve blocks. Tr. 465. Upon exam, her knee was tender, she had hyperalgesia (increased sensitivity), discolored skin, and a slightly antalgic, but unaided, gait. Tr. 465. She reported no new numbness, tingling, or motor weakness. Tr. 465. Selis-Evans's

3

Neurontin dosage was increased and nerve root injections were recommended. Tr. 465. She thereafter received two injections, but at a follow-up appointment with the physician assistant in March she reported no relief and her symptoms and examination findings were unchanged. Tr. 469. A different set of nerve blocks were recommended and her Neurontin was increased. Tr. 469.

In April 2014, Selis-Evans underwent an EMG/NCV study on her right leg that showed normal results. Tr. 358, 368. She received another nerve block in June from pain management specialist Gregg Weidner, M.D., which she later reported was ineffective, stating that the pain had moved to her ankle and foot. Tr. 397. She reported leg weakness and stiffness. Tr. 397.

In October 2014, Selis-Evans visited a pain management center per Dr. Hogan's referral. Tr. 385-387. She described her pain as 8/10, constant and stable, with the intensity located around the knee with some radiation down to her foot. Tr. 385. Upon exam, she had redness around her right knee and an abnormal gait due to pain, no swelling, normal strength, full range of motion, and no atrophy. Tr. 387. She was diagnosed with RSD with a "guarded" prognosis. Tr. 387-388. Because she reported that medications, injections, nerve blocks, and a TENS unit had not helped her pain, it was recommended she return to an aggressive physical therapy regimen. Tr. 387-388.

In January 2015, Selis-Evans saw Dr. Weidner, who recommended she try spinal cord stimulation. Tr. 401-403. Dr. Weidner performed a trial implantation of a spinal cord stimulator in March. Tr. 407. Selis-Evans reported that the stimulator did not improve her walking or ability to go up and down stairs, but it reduced her pain by half. Tr. 410, 412. The stimulator was removed. Tr. 411.

At a follow-up appointment with Dr. Weidner in April 2015, Selis-Evans reported

continued pain throughout her leg. Tr. 446. Upon exam, she had tenderness over her knee and pain with range of motion, no swelling, and normal reflexes. Tr. 447. Dr. Weidner encouraged her to continue physical therapy and range of motion exercises and discussed radiofrequency ablation, although Selis-Evans was not inclined to undergo further procedures. Tr. 449. Dr. Weidner prescribed a trial of Lyrica and released her back to the care of her primary care physician, stating she could return in six months to discuss other options. Tr. 449.

In June 2015, Selis-Evans reported to her primary care physician, Edward Tremoulis, M.D., that she had stopped taking Lyrica due to reported side effects. Tr. 425.

In May 2016, Selis-Evans went to the emergency department to have her foot examined after she had stepped on it wrong and experienced three days of pain that she rated 10/10. Tr. 608. Upon exam, she had tenderness in her lower leg, foot and ankle, no swelling or discoloration, and a normal X-ray. Tr. 610-611. She was discharged home with a recommendation to follow up with her primary care physician. Tr. 612.

In June 2016, Selis-Evans saw Dr. Weidner for a follow-up appointment. Tr. 624. Upon exam, she had knee tenderness, no swelling, normal reflexes, pain with knee range of motion, and full range of motion of her foot. Tr. 626. Dr. Weidner recommended physical therapy, range of motion exercises, radiofrequency ablation, and again released her to her primary care physician for treatment. Tr. 627.

In November 2016, Selis-Evans saw pain specialist Tristan Weaver, M.D., on referral from her primary care physician. Tr. 683. She reported that she had begun experiencing pain in her right arm. Tr. 683. Upon exam, her right arm was clammy compared to her left and she had an antalgic gait. Tr. 685. Her sensation was intact and she was able to move all her limbs purposefully. Tr. 685. Dr. Weaver diagnosed her with RSD of the right arm and leg, but stated

he had no further treatment to offer and instead encouraged her to stay active and avoid prolonged rest to control her pain.  Tr. 686.

In January 2017, Selis-Evans saw her primary care physician Dr. Tremoulis.  Tr. 653.  Upon exam, she had a normal range of motion and no tenderness.  Tr. 654.  Dr. Tremoulis renewed her prescriptions and recommended a follow up in four months.  Tr. 654-655.

In May, Selis-Evans saw Dr. Weaver for her constant pain in her right leg, arm and hand; she stated that she needed to follow up due to her upcoming disability hearing.  Tr. 691.  Upon exam, she had intact sensation, no issues moving her arms and legs, her right arm and leg showed no difference in temperature or color, and she was ambulatory.  Tr. 693.  Dr. Weaver assessed a "questionable diagnosis of [RSD based] on today's examination," explaining that she did not meet enough of the criteria.  Tr. 693.  He stated there was no further intervention he could offer for her reported pain, suggested changing anti-depressants and undergoing a neuropsychological evaluation for cognitive behavioral therapy, and recommended she continue her medication and physical therapy.  Tr. 694.

**C. Opinion Evidence**

**1. Treating Physician**

In February 2016, Dr. Sanko filled out a residual functional capacity questionnaire.  Tr. 603-606.  Dr. Sanko checked boxes on the form indicating that Selis-Evans suffers from RSD with associated chronic pain, weakness, joint tenderness, swelling and stiffness, muscle atrophy, increased sensation, and restricted mobility since July 2013.  Tr. 603.  He opined that Selis-Evans would need to elevate her legs with prolonged sitting but did not answer the question as to what percentage of the workday she would need to do so.  Tr. 605.  Dr. Sanko also declined to

provide opinions as to most other questions regarding physical limitations, such as sitting, standing, walking, and postural maneuvers. Tr. 604-605.

### 2. Consultative Examiner

In May 2016, Selis-Evans underwent a consultative examination with occupational medicine specialist Sushil Sethi, M.D. Tr. 588. Dr. Sethi reviewed Selis-Evans's treatment history, reported symptoms, and performed a physical exam, and concluded that he found no clinical findings of RSD. Tr. 590. Upon exam, she had no muscle atrophy, no swelling, no discoloration of the skin, no glossiness of the skin, no change in skin temperature, normal range of motion in her knee and ankles and a normal gait. Tr. 589. Dr. Sethi opined that she had no limitations in sitting, standing, or walking during an eight-hour workday. Tr. 590.

### 2. State Agency Reviewers

In January 2014, state agency reviewing physician Gerald Klyop, M.D., reviewed Selis-Evans's record and opined that she could stand or walk four hours in a workday and had additional postural limitations. Tr. 132-134. In July 2014, state agency reviewing physician Diane Manos, M.D., reviewed Selis-Evans's record and adopted Dr. Klyops' opinion. Tr. 146, 148.

### D. Testimonial Evidence

#### 1. Selis-Evans's Testimony

Selis-Evans was represented by counsel and testified at both administrative hearings. Tr. 69, 99.

<u>First hearing, April 25, 2016</u>: Selis-Evans testified that she lives with her husband and four children (aged 10 and under) in a one-story house. Tr. 72-73. She has a driver's license and

7

drives about three times a week. Tr. 73-74. Typically, the farthest she drives is a mile or two. Tr. 74.

Selis-Evans explained that she had right knee surgery in July 2013; she had dislocated a kneecap and was supposed to have surgery when she was 18 years old "[a]nd it finally got to the point that I needed to have it done." Tr. 76, 77. After surgery, she started going to physical therapy and they had problems bending her leg back. Tr. 76. When her motion finally improved enough to do physical therapy, her leg started to feel like it was on fire and her skin started to change color. Tr. 76-77. They stopped physical therapy and sent her back to her surgeon, Dr. Sanko, who diagnosed her with RSD in September 2013. Tr. 77. Dr. Sanko sent her to a specialist who performed nerve blocks in her back, but it did not help at all. Tr. 78. She was sent to Columbus and they tried a spinal stimulator but determined that she wasn't a candidate. Tr. 78. She takes medication, Gabapentin, but it does not help at all. Tr. 78-79. Her pain is a constant burning sensation and feels like a blowtorch, or stabbing, and the pain gets so bad she feels like she wants to cut off her leg to get away from it. Tr. 79. She does not experience a minute without the pain. Tr. 79. For the last four months or so, she has also been feeling this pain in her left leg and right arm. Tr. 80.

Selis-Evans stated that she could stand in one place, sit, or walk for about 10 minutes before having to lie down. Tr. 80-81. Also, her leg stiffens up and gives out to the point where she has been falling. Tr. 81. She has fallen countless times because of the pain. Tr. 81. She started to use a cane about six months ago. Tr. 81. She was not prescribed her cane; Dr. Sanko "advised me maybe I should use it, if I'm falling." Tr. 81. She uses the cane all the time except when she is lying down; she is lying down the majority of the time. Tr. 82. When she lies down she elevates her foot and tries to keep it warm because it is colder than her left foot. Tr. 82. She

8

props her foot up on something soft because if anything brushes across it, it hurts. Tr. 83. It is painful to the touch; she can't get in hot water and she cannot take showers sometimes. Tr. 83. When she sits, it is sometimes helpful to elevate her leg, but it will still stiffen up. Tr. 83.

Selis-Evans stated that she has to take her Gabapentin three times a day and she has side effects from it: she is "so out of it," it makes her tired and she falls asleep, and if she wakes up too soon from it she is off balance and dizzy. Tr. 84. Her pain affects her ability to sleep; she gets about 1 to 2 hours of sleep a night and does not sleep during the day. Tr. 85. Her pain also causes memory problems. Tr. 85.

She has also been experiencing problems with her right hand; it will get stuck—freeze—when she uses it a lot or if she keeps it still for too long. Tr. 87. She drops things and when she tries to pick something up it starts to burn. Tr. 87. She needs help doing things around the house; laundry, cooking, taking care of the kids. Tr. 91.

After hearing the testimony, the ALJ discussed with counsel that, based on inconsistent findings in Selis-Evans's medical evidence, he would send Selis-Evans to a consultative examiner and hold a second hearing. Tr. 95.

Second Hearing, July 18, 2017: Selis-Evans testified that, at the time of the second hearing, she was driving only once or twice a week and the farthest she typically drives is to her parents' house 3.7 miles away. Tr. 103-104. She stated that her right leg problems have grown worse and have taken over the whole right side of her leg. Tr. 107. It has turned her right foot in. Tr. 107. It is in her arm, right hip and right side of her back. Tr. 107, 109. Since the time of the last hearing, it's getting more complicated to do basic things around the house. Tr. 107. Her Gabapentin causes her to wake up in the morning off balance and stumble around. Tr. 107. She can't walk around the house or sometimes even get up. Tr. 108. She can't get up to get her

9

children a drink because she is in bad pain. Tr. 108. She has become badly depressed lately because of it. Tr. 108. She rated her daily pain 9/10 with her medication. Tr. 108. She does not get a break from her pain. Tr. 108. Three or four times a week she is dropping things, like plates. Tr. 109. She tries to force herself to cook and clean up; she doesn't want to just sit there and whither away. Tr. 115. She watches television but doesn't remember things she watched. Tr. 115. She plays games on her phone and uses Facebook. Tr. 115. She goes to her children's school functions and church on Sundays. Tr. 116.

Selis-Evans stated that she can sit in one spot for 15-20 minutes before her leg starts to cramp and stiffen. Tr. 111. Then she has to stretch it and move around; to accomplish this, she usually lies down. Tr. 111. She lies down about 65-75% of the day. Tr. 112. Otherwise, she has to get up to tend to her children. Tr. 112. She can stand in one spot for 25-30 minutes, depending on how bad her flare-up is. Tr. 112. She can do no walking. Tr. 112. When asked how she gets around, she stated that she avoids long distances and anything she can that causes her pain. Tr. 112. Lying down doesn't alleviate her pain but it doesn't cause more pain. Tr. 113. The most comfortable position is lying in a recliner with her leg propped up. Tr. 113.

Selis-Evans was not using a cane at the hearing. Tr. 113. When asked why, she stated that she had to stop using it ever since she experienced the problems in her right hand. Tr. 113.

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the second hearing. Tr. 117-123. The ALJ asked the VE to determine whether a hypothetical individual of Selis-Evans's age, education and work experience could perform work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that such an individual could perform jobs with

significant numbers in the national economy such as addresser, document preparer, and inspector/spotter.  Tr. 118-121.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

>   5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his August 3, 2017, decision, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since October 15, 2013, the application date. Tr. 14.

2.  The claimant has the following severe impairments: degenerative joint disease of the right knee, status post right knee arthroscopy; reflex sympathetic dystrophy (RSD); obesity; an anxiety disorder; and a depressive disorder. Tr. 14.

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 15.

4.  The claimant has the residual functional capacity to stand/walk up to 4 hours out of an 8-hour workday. She would be precluded from climbing ladders, ropes, and scaffolds. She could frequently balance and stoop. She could occasionally climb ramps and stairs, kneel, crouch, or crawl. She could have frequent exposure to hazards, including unprotected heights and dangerous machinery. Further, the claimant can perform simple, repetitive tasks, where there are infrequent changes in work duties or processes, not involving a fast assembly line pace, strict production quotas, or more than occasional contact with others. Tr. 17.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5.  The claimant has no past relevant work. Tr. 27.

6.  The claimant was born in 1980 and was 33 years old, which is defined as a younger individual age 18-49, on the date the application was filed. Tr. 27.

7.  The claimant has at least a high school education and is able to communicate in English. Tr. 27.

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 27.

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 28.

10. The claimant has not been under a disability, as defined in the Social Security Act, since October 15, 2013, the date the application was filed. Tr. 29.

## V. Plaintiff's Arguments

Selis-Evans alleges that the ALJ erred when he did not include a limitation in his RFC assessment that Selis-Evans needed to elevate her legs, despite a treating physician opinion setting forth this restriction. Doc. 8, pp. 3-5.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor

13

resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Under the treating physician rule,[3] "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).

Here, the ALJ gave Dr. Sanko's opinion "partial" weight. Tr. 25. He first observed that Dr. Sanko did not fill out the entire functional form. Tr. 25. Indeed, Dr. Sanko put a question mark down where the form asked for assessed limitations on Selis-Evans's ability to sit, stand, walk, lift, carry, or perform postural activities and did not provide any explanation where the form asked. Tr. 604-606. Although he opined that Selis-Evans would need to elevate her leg(s), Dr. Sanko did not answer the related question regarding the percentage of an 8-hour workday she would be required to elevate her leg. Tr. 605. The ALJ explained that he afforded "greater" weight to the portion of Dr. Sanko's opinion setting forth Selis-Evans's RSD diagnosis and that she did not require an ambulatory aid or assistive device, and gave "less" weight to the remaining limitations assessed by Dr. Sanko. Tr. 25. As for his leg elevation restriction, the ALJ observed that the record showed that Selis-Evans had only intermittent, non-pitted edema in her right leg and that no other medical providers found her condition to require leg elevation. Tr. 25.

Selis-Evans argues that the ALJ erred because he "is unable to point to any medical evidence that directly contradicts Dr. Sanko's opinion." Doc. 8, p. 4. But the ALJ is not

---

[3] Selis-Evans states, "the treating physician rule is no longer applicable." Doc. 8, p. 4. This is incorrect; the treating physician rule is applicable to claims filed before March 27, 2017, such as Selis-Evans's claim. *See* 20 C.F.R. § 416.927 ("For claims filed [] before March 27, 2017, the rules in this section [regarding opinion evidence] apply. For claims filed on or after March 27, 2017, the rules in § 416.920c apply.").

14

required to identify evidence that "directly contradicts" opinion evidence; the ALJ is only tasked with determining whether there is inconsistent evidence. *See Wilson*, 378 F.3d at 544. The absence of any medical record indicating that Selis-Evans needs to elevate her leg during the five-year period she received extensive treatment from a number of providers is "inconsistent" with Dr. Sanko's opinion that Selis-Evans needs to elevate her leg. Selis-Evans concedes that there is no medical evidence other than Dr. Sanko's opinion that she needs to elevate her leg. See Doc. 8, p. 2 (Selis-Evans' brief (which contains no summary of medical evidence contrary to the Court's Initial Order, Doc. 4, p. 2), stating, "Plaintiff agrees generally with the summary of medical facts contained in ALJ Yerian's Opinion.").

As Selis-Evans acknowledges, the only evidence in the record that supports Dr. Sanko's opinion that she has to elevate her right leg is her own testimony. Doc. 8, p. 4. But the ALJ, in a long, detailed and thoughtful discussion, did not find Selis-Evans to be entirely credible, Tr. 23-24, a finding that Selis-Evans does not challenge. Finally, Selis-Evans's related argument—that the ALJ erred when relying on VE testimony based on an RFC with no restriction for leg elevation (Doc. 8, pp. 4-5)—also fails because, as explained above, the ALJ's RFC assessment was not in error.

In sum, the ALJ did not err when he did not adopt the leg elevation restriction contained in Dr. Sanko's opinion.

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: August 2, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

## **OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).